W. J. USERY, Jr. [Successor to John T. Dunlop], Secretary of Labor, United States Department of Labor, Appellant-Cross-Appellee,

v.

Larry YATES, Appellee-Cross-Appellant.

Nos. 76–1329 and 76–1330.

United States Court of Appeals, Sixth Circuit.

Argued April 5, 1977.

Decided Nov. 1, 1977.

Carin Ann Clauss, Jacob I. Karro, U. S. Dept. of Labor, Peter B. Dolan, Washington, D. C., Marvin Tincher, U. S. Dept. of Labor, Nashville, Tenn., for appellant-cross-appellee.

Frederick J. Lewis, McKnight, Hudson, Lewis & Henderson, Memphis, Tenn., for appellee-cross-appellant.

Before WEICK, EDWARDS and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

In 1965 defendant Larry Yates purchased for $3,000 a gas station business in Martin, Tennessee. Yates had no previous experience in this field and employed his brother, then ill and unable to work regularly, to assist him in the operation, known as the "Gateway Service Station." The business was located on premises also occupied by Argo-Collier Truck Lines Corporation (A–C), a common carrier by motor vehicle operating over irregular routes out of Martin, Tennessee and into a number of states by authority of the Interstate Commerce Commission.

The Gateway Service Station shared office space with A–C, although they operated separately, and neither business had any financial interest in the other. The gas station had six fuel pumps and space to accommodate large trucks for the provision of both gasoline and diesel fuel. Gateway, during the period involved, sold diesel fuel, gasoline and a relatively small amount of motor oil, but the majority of its business was composed of sales of diesel fuel to motor transport trucks. Approximately 89% of the total gallonage sold consisted of diesel, which also constituted about 85% of Gateway's total annual dollar volume of business. Of the total volume of diesel and gasoline sales until July, 1973, about 73% constituted sales made directly to A–C. Thereafter, A–C changed its operations to utilize primarily drivers who had their own trucks, and many of the sales formerly made directly to the corporation were instead made to the drivers who operated under contract with A–C. As the trucks were refrigerated, approximately 40% of A–C's use of diesel fuel was in the refrigeration units, which were operated at all times. The station remained open to the general public and no preference was made, either by discount in price or in any other manner, to any customer or group of customers.

Yates' wife, Dorothy, participated in the Gateway operation by keeping the books and records. In June, 1972, Yates' 16-year-old nephew, Timothy Jones, came to live and board with the family and desired to work at the station. Concerned about his nephew's age, Yates inquired of a public accountant about possible liability under the wage and hour laws. The accountant, Tom Copeland, called John Simmons, the area representative of the Wage and Hour Division of the Department of Labor, who told him that a 16-year-old could be employed for this type of work and that Gateway was exempted from all provisions of the law because of its low dollar volume of business. From time to time Yates also employed his brother, Tyler, and one Larry McCollum, who was married to Yates' niece and was a full-time student at the University of Tennessee while he was working at the station. Yates supplied McCollum with additional money for tuition and for books.

Gateway paid its employees wages ranging from $10 to $15 per 12-hour shift and most of the employees worked in excess of 40 hours a week without receiving additional overtime compensation.

In 1974, the Secretary brought an action under Section 17 of the Fair Labor Standards Act of 1938, *as amended,* 29 U.S.C. § 201 et seq. (1970), to enjoin Yates from violating the record keeping, minimum wage, and overtime provisions and to restrain the continued withholding of wages alleged to be due under the Act. Following a non-jury trial, the district court held that the defendant had carried a "bare burden" of demonstrating that the station came within the Section 13(a)(2) exemption for certain retail or service establishments. The Secretary appeals from that judgment and Yates cross appeals from rulings of the

district court which excluded the testimony of several witnesses.[1]

As sympathetic as we are to Mr. Yates' claim that the Secretary's decision to enforce the Act against him is nothing more than bureaucratic overkill, we are nevertheless obliged to reverse the judgment of the district court in obedience to the language of the Act as construed by the United States Supreme Court in *Idaho Metal Works v. Wirtz*, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966), and out of respect for the discretion possessed by the Secretary of Labor to interpret and administer the Act.

■ The minimum wage and maximum hour provisions of the Fair Labor Standards Act protect an employee who is "engaged in commerce or in the production of goods for commerce," or is employed "in an enterprise engaged in commerce or in the production of goods for commerce," 29 U.S.C. §§ 206(a), 206(b), 207(a)(1), 207(a)(2) (1970). An enterprise is defined by the statute to mean only those businesses whose "annual gross volume of sales made or business done is not less than $250,000." 29 U.S.C. § 203(s)(1) (Supp. V 1975). Since the parties stipulated at trial that Gateway did not have that volume of sales, the statute applies to Gateway only if the employees of the gas station were "engaged in commerce." In determining whether such an employee is so engaged the question is whether his work is " 'so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity.' " *Mitchell v. Lublin, McGaughy & Associates,* 358 U.S. 207, 212, 79 S.Ct. 260, 1264, 3 L.Ed.2d 243 (1959); *Mitchell v. Vollmer & Co.,* 349 U.S. 427, 429, 75 S.Ct. 860, 99 L.Ed. 1196 (1955).

■ It is undisputed that most of the vehicles fueled by Gateway's employees were engaged in interstate transportation of goods. We hold that in fueling those vehicles the employees did in fact directly facilitate interstate commerce and fall within the overall coverage of the Act. This conclusion is supported by an interpretative regulation issued by the Secretary, which advises that filling station employees who service interstate vehicles are "engaged in commerce." [2]

The Secretary argues that the district court erroneously found Gateway to be exempted from the minimum wage and maximum hour provisions by reason of Section 13(a)(2) of the Act, which then stated:

§ 213. Exemptions.

(a) The provisions of sections 206 and 207 of this title shall not apply with respect to—

. . . . .

1. The Secretary had also claimed that the employment of Timothy Jones violated the child labor provisions of the Act. The court agreed with this position, correctly holding that the exemption in Section 13(a)(2) does not apply to the restrictions on child labor and finding a technical violation. However, it refused to grant any damages or to order injunctive relief. No appeal is made from this part of the judgment.

2. 29 C.F.R. § 779.256 (1976) provides:
§ 779.256 Conditions for enterprise coverage of gasoline service establishments.
(a) The requirement that the enterprise must be "an enterprise engaged in commerce or in the production of goods for commerce" is discussed in §§ 779.237–779.243. Those sections explain which employees are engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person. In connection with the discussion in those sections as it concerns employees of gasoline service establishments, it should be noted that as a general rule such employees normally are "engaged in commerce or in the production of goods for commerce" within the meaning of the Act. For example, gasoline filing (sic) station employees servicing motor vehicles used in interstate transportation or in the production of goods for commerce have always been regarded as being "engaged in commerce or in the production of goods for commerce" within the meaning of the Act. Such employees will also be considered as engaged in handling, selling or otherwise working on goods that have been moved in or produced for commerce by any person, if the gasoline or lubricating oils or the other goods with respect to which they perform the described activities have come from outside the State in which the establishment is located.

(2) any employee employed by any retail or service establishment (except an establishment or employee engaged in laundering, cleaning, or repairing clothing or fabrics or an establishment engaged in the operation of a hospital, institution, or school described in section 203(s)(4) of this title), if more than 50 per centum of such establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, and such establishment is not in an enterprise described in section 203(s) of this title or such establishment has an annual dollar volume of sales which is less than $250,000 (exclusive of excise taxes at the retail level which are separately stated). A "retail .or service establishment" shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry . . . .

29 U.S.C. § 213(a)(2) (1970), *as amended*, 29 U.S.C.A. § 213(a)(2) (Supp.1977).

A business must meet three tests to qualify for the exemption as a retail or service establishment under Section 13(a)(2). First, more than 50% of its annual dollar volume of sales of goods or services must be made within the state. Second, it must have an annual dollar volume of sales less than $250,000. Third, it must be a "retail or service establishment," which is defined as "an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." Our concern here is with the third requirement, particularly whether or not 75% of Gateway's sales are "recognized as retail sales."

 With regard to the scope of our review, the Supreme Court has stressed the "considerable discretion possessed by the Secretary [of Labor] as the one responsible for the actual administration of the Act." *Idaho Metal Works, supra,* 383 U.S. at 205, 86 S.Ct. at 747. While the Secretary's interpretative regulations are not binding on the court, they do constitute a "body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Homemakers Home & Health Care Services, Inc. v. Carden,* 538 F.2d 98 (6th Cir. 1976). Also, it is settled that the exemptions under the Act are to be narrowly construed against the party asserting them and "their application limited to those establishments plainly and unmistakably within their terms and spirit." *Brennan v. Southern Productions, Inc.,* 513 F.2d 740, 744 (6th Cir. 1975); *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960). The employer has the burden of showing that he is entitled to the benefit of a particular exemption. *Mitchell v. Kentucky Finance Co.,* 359 U.S. 290, 291, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959).

The heart of the Secretary's position on appeal, and the one we find to be controlling ultimately, is his assertion that diesel fuel is the type of item that can never be sold at retail. If so, then Gateway cannot qualify as a retail establishment as far more than 25% of its annual dollar volume of sales consisted of diesel fuel sales. The Secretary has so classified diesel, at least when used as a truck fuel, in an interpretative regulation:

(7) Sales of diesel fuel (and LP gas) for use as truck or bus fuel and the repair and servicing of trucks and buses used in over-the-road commercial transportation (including parts and accessories for such vehicles) are specialized goods and services "which can never be sold at retail * * * whatever the terms of sale." (*Idaho Sheet Metal Works, Inc. v. Wirtz,* 383 U.S. 190, 202, 86 S.Ct. 737, 745, 15 L.Ed.2d 694, rehearing denied 383 U.S.: 963, 86 S.Ct. 1219, 16 L.Ed.2d 305; *Wirtz v. Steepleton General Tire Company, Inc.,* 383 U.S. 190, 202, 86 S.Ct. 737, 15 L.Ed.2d 694, rehearing denied 383 U.S. 963, 86 S.Ct. 1219, 16 L.Ed.2d 306.) Sales of these items are nonretail whether made by truck stops or other establishments (see paragraphs (c)(4) and (5) of this section).

29 C.F.R. § 779.371(7) (1976). Yates argues that this interpretation is incorrect.

In *Idaho Metal Works, supra,* the Supreme Court considered the proper interpretation to be given the statutory language defining a retail or service establishment. While a literal reading of the language focuses simply upon how a "particular industry" views the questioned sales transactions, the Supreme Court examined the legislative history of the Act and held that the industry custom and usage were not the conclusive consideration. Instead, the Court concluded that the general inquiry should be to determine first whether the sale of a particular type of goods or services can ever qualify as retail whatever the term of sales. If the answer is affirmative, then it is necessary to determine whether the terms or circumstances of a sale of those goods or services make it a retail sale. 383 U.S. at 202–03, 86 S.Ct. 737.

The Court noted that a "retail concept" typically applied to those sales transactions involving goods or services frequently acquired by householders for non-commercial use. Once this attribute was established, a sale of such goods or services could be considered a retail sale whether made to a private householder or a business user. However, the Court also concluded that Congress intended "that the retail exemption extend in some measure beyond consumer goods and services to embrace certain products almost never purchased for family or noncommercial use." 383 U.S. at 203, 86 S.Ct. at 746. Two examples, as indicated by the legislative history, were the sale of farm implements and small trucks. While unable to draw a precise line between such articles and others like industrial machinery which can never be sold at retail, the Court described a few guiding characteristics:

> [T]heir employment is very widespread as is that of consumer goods; they are often distributed in stores or showrooms and by means not dissimilar to those used for consumer goods; and perhaps it can be said that they are very frequently used in commercial activities of limited scope. 383 U.S. at 204, 86 S.Ct. at 746.

Applied to the facts in *Idaho Metal Works,* the Court held that a sheet metal company did not qualify as a retail establishment where 83% of its gross income was derived from the fabrication and maintenance of potato processing equipment. Such goods clearly appeared to have no private or noncommercial utility and bore little resemblance to those few strictly commercial articles that could be sold at retail. Thus they could not be the subject of a retail sale whatever the pricing and quantity of particular sales.

Additionally, the Court examined a tire company which derived more than half of its dollar volume from sales to companies operating fleets of commercial vehicles. The government argued that tire transactions relating to large trucks and industrial machinery were intrinsically nonretail because such vehicles were analogous to industrial machinery and were closely tied to interstate commerce. While admitting the argument had some force, the Court observed that small trucks were among the few commercial articles clearly viewed by Congress as retailable and concluded:

> No reason appears why the sale of tires for those [small] trucks should be distinguished and not allowed to qualify as retailable items. The strength of the Government's position lies in its readiness to separate big trucks and tires from little trucks and tires. The Secretary, however, seemingly has chosen not to classify truck tires on this basis but instead treats all truck tires as capable of being sold at retail. A decision of this kind, no doubt turning in part on problems of administration and facets of industry practice, clearly implicates the Secretary's discretion, and we see no cause to disturb its exercise in this case.

383 U.S. at 207–08, 86 S.Ct. at 748 (footnote omitted). Thus, the Court held the sale of tires did have a retail concept. However, it further held that the company was not an exempted retail establishment because a

large proportion of the sales did not in fact fall in the retail category by reason of the large quantities sold and the significant price discounts.

Similarly, Yates contends that the sale of diesel for use in retailable trucks cannot be distinguished from sales of the trucks themselves and thus should qualify as retailable items. The evidence shows that Yates sold a limited quantity of diesel for use in small trucks and farm vehicles. It is also true that a small number of automobiles now employ this fuel. However, the record simply fails to show that diesel is sold in any significant amount as fuel for small vehicles or farm implements. Rather, it indicated that the overwhelming use of diesel fuel is in large trucks engaged in commercial, interstate transportation of goods. We need not make a final, definitive determination as to this fact. It is enough to note that the record gave sufficient support to this conclusion to respect the Secretary's decision to classify all sales of diesel fuel as incapable of being sold at retail. As in *Idaho Metal Works, supra,* 383 U.S. at 208, 86 S.Ct. 737, we see no reason to disturb this exercise of his discretion. This is especially true on the particular facts of this case, where the great bulk of diesel sales was actually made to large trucks carrying on large-scale, commercial operations.

Accordingly, the judgment of the district court is reversed and the cause remanded for further proceedings consistent herewith.