682 F.2d 185
 25 Wage & Hour Cas. (BN 757, 95 Lab.Cas. P 34,235
 Raymond J. DONOVAN, Secretary of Labor, United States
Department of Labor, Appellant,
v.
WILLIAMS CHEMICAL CO., INC., a corporation and doing
business as Dooley Oil Company, and Edwin G.
Dooley, an Individual, Appellees.
 No. 81-1999.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 9, 1982.
Decided July 2, 1982.
 
 T. Timothy Ryan, Jr., Sol. of Labor, Beate Bloch, Associate Sol., Mary-Helen Mautner, Eleanor R. Jenkins, Attys., U. S. Dept. of Labor, Washington, D. C., for appellant.
 J. Michael Shaw and James A. Arnold, II, Fort Smith, Ark., for appellees.
 Before LAY, Chief Judge, ROSS and McMILLIAN, Circuit Judges.
 McMILLIAN, Circuit Judge.
 
 
 1
 The Secretary of Labor (Secretary) appeals from portions of a final judgment entered in the District Court for the Western District of Arkansas after a bench trial, finding that Williams Chemical Co. d/b/a Dooley Oil Co. (the company) had violated the minimum wage, overtime compensation and recordkeeping provisions of the Fair Labor Standards Act (the Act), 29 U.S.C. § 201 et seq. The court enjoined the company from future violations and awarded back pay to twenty-three employees for the years 1975 and 1976.
 
 
 2
 For partial reversal the Secretary argues that the district court erred in (1) computing the back pay awards of husband-wife team employees; (2) allowing a credit for living quarters and utilities provided to six husband-wife team employees; (3) failing to enjoin Edwin G. Dooley individually; and (4) finding that two of the company's stations were exempt under the retail establishment exemption to the Act, 29 U.S.C. § 213(a)(2).[1] We affirm the district court on all issues except the court's allowance of a credit for living quarters and exemption of the two stations under § 213(a)(2). On these issues we reverse and remand for further proceedings.
 
 
 3
 The company operates approximately thirty self-service gasoline stations located in Arkansas, Missouri and Oklahoma. Two of the stations, Summit and Vinita, sell diesel fuel in addition to gasoline. During 1975 and 1976, more than twenty-five percent of the annual dollar volume of sales at these stations consisted of diesel fuel.
 
 
 4
 The company hired either one married couple or two unrelated individuals to manage each station. The managers' primary duty was to collect money from customers who pump their own gas. Six married couples were hired to manage stations where living quarters were located on the premises. Five of the living quarters were trailers which differed in size, condition and location, and one was a house. Utilities were included with the facilities.
 
 
 5
 All employees were instructed to keep the stations open for approximately eighty hours per week. The company had no written policy regarding the number of hours that each employee was supposed to work. In addition, the instructions to the married couples as to whether they were to work together or alone were vague and imprecise.
 
 
 6
 Before a Wage and Hour Division investigation in 1976, the company kept no records as to the hours its employees worked. At that time the Department of Labor's compliance officer informed the company of its recordkeeping responsibilities under § 11(c) of the Act and thereafter the company instituted a time card system.
 
 
 7
 The Secretary initiated the present action to enjoin the company and its president, Edwin Dooley, from violating the Act's minimum wage, overtime compensation and recordkeeping provisions. The Secretary also sought to recover back wages owing the employees as a result of the violations.
 
 
 8
 After a bench trial the district court found that the company had failed to keep accurate records[2] and that, as a result, numerous employees had received less than the required minimum wage and overtime compensation. The court entered an injunction restraining the company from committing future violations and ordering the payment of back wages to twenty-three employees. The employees included both unrelated individuals and husband-wife teams.
 
 
 9
 In computing the amount of back wages due the individual employees the district court relied primarily on the employees' recollections as to the actual number of hours worked. The individual employees testified that one person was on duty during a shift and that, due to the arrangement of the shifts, the employees often worked in excess of forty hours per week. This award to the individual employees is not challenged on appeal.
 
 
 10
 In contrast, the husband-wife teams testified, for the most part, that their shifts overlapped and that both spouses were on duty for the total number of hours that the station was open. The district court, with one exception,[3] did not compute the back pay awards based on this testimony but rather found that each spouse should only have worked forty hours per week. Therefore, their back pay awards were computed by dividing the total number of hours worked in half and compensating each spouse for hours worked in excess of forty per week.
 
 
 11
 The district court also found that the reasonable value of the trailers and utilities was $200 per month and of the house and utilities, $240 per month. It allowed those amounts as a credit against unpaid minimum wages and overtime compensation. In addition, the court found that the sale of diesel fuel at the Vinita and Summit stations were retail sales and that the employees at these stations were therefore exempt under § 13(a)(2) of the Act because the stipulated annual dollar volume of sales at each of those stations was less than the statutory minimum during 1975 and 1976. Finally, the court dismissed Edwin G. Dooley individually from the action based on its finding that he was not an employer within the meaning of the Act.
 
 Husband-Wife Teams
 
 12
 The Secretary argues that the husband-wife teams were entitled to back wages for all the hours they testified they were at the stations under the principles established in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), and Mumbower v. Callicott, 526 F.2d 1183 (8th Cir. 1975). The Secretary stresses that the company did not prove an express agreement with its employees concerning their wages and hours and reasons that the employees were therefore entitled to be compensated for all the hours they spent at the station. We disagree and conclude that the district court's calculation of back wages was not clearly erroneous.
 
 
 13
 The term "work" is not defined in the Act. Therefore, the concept of "hours worked" or "compensable working time" has necessarily evolved through case law to delineate which employee activities are covered under the Act for purposes of minimum wage and maximum hours requirements. The definition of compensable working time includes "duties performed by an employee before and after scheduled hours, even if not requested ... if the employer 'knows or has reason to believe' the employee is continuing to work, 29 C.F.R. § 785.11, and the duties are an 'integral and indispensable part' of the employee's principal work activity." Mumbower v. Callicott, 526 F.2d at 1188, citing Steiner v. Mitchell, 350 U.S. 247, 256, 76 S.Ct. 330, 335, 100 L.Ed. 267 (1956); 29 C.F.R. § 785.24, .25 (1974).
 
 
 14
 In determining whether hours are compensable it is the duty of the court to look to the employment agreement to determine what the parties intended, and where that is impossible, to look to the circumstances to determine what was intended. See Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944); Rural Fire Protection Co. v. Hepp, 366 F.2d 355 (9th Cir. 1966). "The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was." Skidmore v. Swift & Co., 323 U.S. at 137, 65 S.Ct. at 163.
 
 
 15
 In the present case the district court found that the company's instructions to its employees concerning shifts and number of hours to be worked were vague and imprecise.[4] However, the court also examined the surrounding circumstances and found that the employment arrangement between the company and the husband-wife teams was that each spouse was to work a forty-hour shift alone. The court reasoned that the employer's policy was evidenced by the facts that the paychecks were split evenly between the spouses and each check reflected forty hours of work and that the time cards, while not accurate, indicated that each spouse had worked forty hours. In addition, the court stressed the fact that only one person was required to manage the station per shift.
 
 
 16
 The district court further found that the overlapped time did not constitute compensable working time for both spouses within the meaning of the Act. The court reasoned that because of the close proximity of the lodgings and the station it was more likely that the off-duty spouse would be at the station to visit the on-duty spouse than to work. The court concluded that such time was not compensable working time and that even the occasional performance of the on-duty attendant's job was a matter of the employee's own personal convenience and companionship and not a product of any policy or requirement of the company.[5]
 
 
 17
 The Secretary argues that the fact the district court awarded back pay for the number of hours testified to by Robert and Inez Grady is evidence that the district court erred in not awarding full compensation to the other couples.
 
 
 18
 We disagree. The court considered the circumstances surrounding each station and the testimony of each station manager. The court made detailed factual findings distinguishing the Gradys' situation from those of the other husband-wife teams and concluded that they had been permitted to work all the hours they testified to, see note 3. In addition, we note that the court resolved issues of credibility in favor of the Gradys and against the other couples. We have carefully reviewed the record and conclude that the district court's findings supporting its computation of back wages to the husband-wife teams are supported by substantial evidence and are not clearly erroneous.
 
 Credit for Lodging
 
 19
 The Secretary argues that the district court erred in granting a $200 per month credit for the trailers and utilities and $240 per month credit for the house and utilities against unpaid minimum wages and overtime compensation due six husband-wife teams. The $200 and $240 figures were based on the employer's statement of what he considered the trailers and house to be worth. The district court expressed "some reluctance" but allowed the credit. The Secretary argues that the credit should not have been allowed because the company failed to sustain its burden of proving the "reasonable cost" of the lodgings by producing records or other credible evidence. We agree.
 
 
 20
 Section 3(m) of the Act, 29 U.S.C. § 203(m), allows employers to include the reasonable cost of providing meals, lodging, or other facilities in employee wages for purposes of the Act. The regulations promulgated by the Secretary define "reasonable cost" "to be not more than the actual cost to the employer of the board, lodging, or other facilities customarily furnished by him to his employees." 29 C.F.R. § 531.3(a). " 'Reasonable cost' does not include a profit to the employer or to any affiliated person." Id. § 531.3(b). The regulations require employees to keep certain records of the cost incurred in furnishing board, lodging or other facilities, id. § 516.27(a), and also require the employer to maintain records showing additions or deductions from wages paid for board, lodging or other facilities on a work week basis. Id. § 516.28(b).
 
 
 21
 In the present case it is undisputed that the employer did not keep the required records and offered no evidence except its own statement as to what the company considered the worth of the trailers to be.[6] The company did not attempt to substantiate the valuation by explaining how the value was reached or indicate whether or not it included profit. It is undisputed that the trailers differed in size, location, and state of repair. Yet the company indicated that it considered each one of the trailers and the utilities used to be worth the same amount.
 
 
 22
 On appeal the company argues that the credit should be affirmed because the Secretary did not present sufficient evidence that the value of the lodgings was other than the amount of the credit, citing Marshall v. Truman Arnold Distributing Co., Inc., 640 F.2d 906 (8th Cir. 1981) (Truman Arnold ). We disagree.
 
 
 23
 In Truman Arnold this court held that when employment contracts signed by the employer and employees stated a specific value for the living quarters, the district court's reliance on the contracted value as establishing the reasonable cost was not clearly erroneous. In contrast, in the present case the employees had no contractual agreement with the employer concerning the value of the living quarters. We conclude that Truman Arnold is distinguishable on the basis that the employer in the present case introduced no evidence supporting its statement of worth at trial.
 
 
 24
 In addition, we reject the company's suggestion that the burden of proving the "reasonable cost" of providing board, lodging or other facilities is on the Secretary. The facts relevant to the actual cost to the employee of the facilities are peculiarly in the employer's knowledge. The employer has the obligation, under the regulations, to keep records concerning costs, and its failure to do so does not shift the burden of proof to the Secretary. See Donovan v. New Floridian Hotel, Inc., 676 F.2d 468 (1982, 5th Cir.) and cases cited therein.
 
 
 25
 Accordingly, the district court's finding on this issue is reversed and remanded for proceedings consistent herewith. On remand the district court may consider additional evidence as to the reasonable value of the lodgings and utilities.[7]
 
 
 26
 Denial of injunction against Edwin G. Dooley as an individual
 
 
 27
 The district court dismissed Edwin G. Dooley, president of the company, as an individual from the action on the basis that he was not an employer within the meaning of the Act. The Secretary argues that Dooley should be enjoined personally because the evidence demonstrated that he was the company's major decision maker and had personally hired many of the employees involved in the present action.
 
 
 28
 There is no dispute over the company's financial ability to sustain any fines or to comply with the injunction. In addition, the district court's judgment enjoined the corporate defendant from future violations of the Act. This injunction extends to the corporation's officers, representatives and agents and, therefore, applies to Edwin G. Dooley in his capacity as a corporate officer. In view of the above, we conclude that the district court's failure to enjoin Dooley personally, if error, is harmless error.
 
 Sales of Diesel Fuel
 
 29
 The parties stipulated that sales of diesel fuel accounted for more than twenty-five percent of the annual dollar volume of sales at the Summit and Vinita stations during the years 1975 and 1976. The parties further stipulated that if the diesel fuel sales qualified as "retail" sales the stations would be entitled to the "retail or service establishment" exemption in Section 13(a)(2) of the Act. 29 U.S.C. § 213(a)(2).[8] The district court found that the diesel fuel sales were retail sales because all the sales were made at the same undiscounted price and because there was no basis to distinguish between sales of gasoline, retail sales, and sales of diesel fuel.
 
 
 30
 On appeal the Secretary argues that the district court's finding is clearly erroneous because it is based exclusively on price structure rather than the nature of the customer to whom diesel fuel is sold. We agree.
 
 
 31
 The Act defines "retail or service establishment" as "an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry ...." 29 U.S.C. § 213(a)(2). In Idaho Metal Works v. Wirtz, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966) (Idaho Metal Works), the Supreme Court examined the proper interpretation to be given the statutory language defining a retail or service establishment. The Court noted that while a literal reading of the language focuses upon how a "particular industry" views the questioned sales transaction, the legislative history of the section indicated that industry custom and usage were not conclusive. The Court concluded that the proper inquiry is "to ask first whether the sale of a particular type of goods or services can ever qualify as retail whatever the terms of the sale; if and only if the answer is affirmative is it then necessary to determine the terms of circumstances that make a sale of those goods or services a retail sale." Id. at 202-03, 86 S.Ct. at 745.
 
 
 32
 In Idaho Metal Works the Court also stressed the "considerable discretion possessed by the Secretary as the one responsible for the actual administration of the Act," id. at 205, 86 S.Ct. at 747, and noted that the Secretary has exercised this discretion to decide what kinds of sales are retail in nature. Id.
 
 
 33
 The Secretary has decided by regulation that sales of diesel fuel for use as truck or bus fuel are the kinds of specialized goods which can never be sold at retail, whatever the terms of the sale, 29 C.F.R. § 779.371(c)(7).[9] This official interpretation has been given explicit judicial approval by the one circuit to consider it. In Usery v. Yates, 565 F.2d 93, 96-99 (6th Cir. 1977) (Yates ), the Sixth Circuit examined the diesel fuel regulation in light of the Supreme Court's analysis of § 13(a)(2) and its legislative history in Idaho Metal Works. In a carefully reasoned opinion, it ruled that the Secretary's decision to classify all sales of diesel fuel as incapable of being sold at retail is reasonable and should not be disturbed.
 
 
 34
 On appeal the employer argues that Yates is distinguishable on the basis that the service station at issue in that case was located on premises owned by a trucking company and seventy-three percent of the station's sales were made directly to that one customer. The employer asserts that there is no conclusive evidence that the sales of diesel fuel in the present case were made to trucks and busses, as required by 29 C.F.R. § 779.371(c)(7). We disagree.
 
 
 35
 An employer who asserts it is exempt from the Act "has the burden of establishing the exemption affirmatively and clearly." Schoenhals v. Cockrum, 647 F.2d 1080, 1081 (10th Cir. 1981), citing Legg v. Rock Products Manufacturing Corp., 309 F.2d 172, 176 (10th Cir. 1962). Exemptions are to be narrowly construed and are limited to those establishments plainly within the terms and spirit of the exemption involved. See Arnold v. Ben Kanowsky, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960); Willmark Service System, Inc. v. Wirtz, 317 F.2d 486, 490 (8th Cir.), cert. denied, 375 U.S. 897, 84 S.Ct. 170, 11 L.Ed.2d 125 (1963).
 
 
 36
 In the present case the station managers testified that most of the diesel fuel sales were made to over-the-road truckers. The company offered no evidence that it sold any significant amount of its diesel fuel to personal users. Therefore, the controlling facts in Yates are indistinguishable from those here; in both "the overwhelming use of diesel fuel is in large trucks engaged in commercial, interstate transportation of goods." Yates, 565 F.2d at 99.
 
 
 37
 The company also cites Harlow v. Bud Lake Truck & Car Stop, Inc., 261 F.Supp. 191 (D.Mont.1966), for the proposition that a distinction based on a difference in fuels is arbitrary. In that case the district court held that a truck stop employer with retail sales of under $1,000,000 per year was not exempt from all provisions of the Act as a retail service establishment, but was a gasoline station within the Act and was exempt only from the overtime provisions of the Act. The court indicated, in dicta, that "(a) distinction based upon the difference between fuel and gasoline would seem to be somewhat arbitrary since trucks traveling in interstate commerce are powered by both fuels." Id., 261 F.Supp. at 193. That case does not refer to the Secretary's diesel fuel regulation and is not persuasive on the facts before us.
 
 
 38
 We conclude that the diesel fuel regulation is applicable to the facts of the present case. As in Idaho Metal Works, 383 U.S. at 208, 86 S.Ct. at 748 and Yates, 565 F.2d at 99, we see no reason to disturb this exercise of the Secretary's discretion.
 
 
 39
 Accordingly, the district court's finding on this issue is reversed and remanded for further proceedings consistent herewith.
 
 
 40
 The judgment of the district court is affirmed in part and reversed and remanded in part.
 
 
 
 [1]
 The Secretary also alleged that the district court erred in allowing the company to deduct $51 for shortages in receipts from the wages of Jimmy Landry. The court found that Landry had worked for the company a total of nine days, eight of those days were worked at the Muskagee Station which the Secretary acknowledges was exempt from the Act's coverage. It is not clear from the record whether any portion of the $51 deduction was accrued at a non-exempt station. We decline to decide this issue under the doctrine of de minimis and vacate the district court's findings regarding cash shortages
 
 
 [2]
 The time cards indicated that each employee had only worked forty hours. However, several employees testified that they were instructed to fill in only forty hours and others testified that their time cards were filled in by the employer
 
 
 [3]
 The court awarded back pay for the total number of hours testified to by Robert and Inez Grady. The award was based on the following findings: (1) the Gradys were elderly and the company should have concluded that it would be more difficult for them to manage a station alone; (2) the station they operated was larger than the other stations; (3) the Gradys gave credible testimony that they had been instructed to operate the station together; (4) the Gradys were busy most of the time they spent at the station; and (5) the Gradys' station was located near the company's headquarters so that it was likely the company had known the Gradys were working together
 
 
 [4]
 The testimony relating to the company's instructions was controverted. Generally the husband-wife teams testified that they were simply told to keep the station open and that no one instructed them that they were not to work together. This was contradicted by some of the company's witnesses who testified that the husband-wife teams were explicitly told to work separate shifts. Robert and Inez Grady, who were awarded full back pay, were the only couple who testified that they had been instructed to work together. See note 3
 
 
 [5]
 The Secretary appears to assert that the district court found that the husband-wife teams worked all the hours they testified they were at the stations, and therefore, regardless of their motivation, they were entitled to be compensated. We disagree with that characterization. The district court found, and we agree, that not all of the hours spent at the stations were compensable working time under the Act. This finding is supported by couples' testimony that when both were at the station they would alternate customers, provide full service to customers or just keep each other company
 
 
 [6]
 In its brief the company asserts that it did maintain records reflecting the reasonable costs of utilities but that the records were not introduced at trial. These records may be introduced on remand
 
 
 [7]
 We note that the regulations specify three methods by which an employer may ascertain whether facilities are part of "wages" within the meaning of § 3(m). First, the employer may calculate the "reasonable cost" of furnishing facilities, 29 C.F.R. § 531.3. Second, the employer may petition the Wage and Hour Administrator of the Department of Labor to make a determination of the reasonable cost of furnishing the facilities, 29 C.F.R. § 531.4. Third, the employer may petition the Wage and Hour Administrator to determine the "fair value" of the facilities and to use that determination in lieu of the actual cost of furnishing the facilities, 29 C.F.R. § 531.5
 
 
 [8]
 All the other stations, other than Muskagee which is not involved in the present appeal, were ineligible for the exemption during 1975 and 1976 because their total annual dollar volume of sales disqualified them
 
 
 [9]
 29 C.F.R. § 779.371(c)(7) provides in relevant part:
 "(c) Nonretail automobile and truck sales and servicing. None of the following ... will be considered as retail: ... (7) Sales of diesel fuel (and LP gas) for use as truck or bus fuel ... are specialized goods and services 'which can never be sold at retail * * * whatever the terms of the sale.' "