722 F.2d 397
 26 Wage & Hour Cas. (BN 1083, 26 Wage & Hour
Cas. (BN 862,
99 Lab.Cas. P 34,473
 Raymond J. DONOVAN, Secretary of Labor, U.S. Department of
Labor, Plaintiff/Appellee/Cross-Appellant,
v.
TONY AND SUSAN ALAMO FOUNDATION, Tony Alamo, Susan Alamo and
Larry Larouche, Defendants/Appellants/Cross-Appellees.
 Nos. 83-1463, 82-2549.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 17, 1983.
Decided Dec. 5, 1983.
As Amended Feb. 27, 1984.
Rehearing Denied March 1, 1984.
 
 Roy Gean, Jr., Roy Gean, III, Gean, Gean & Gean, Fort Smith, Ark., for defendants/appellants/cross-appellees.
 Francis X. Lilly, Deputy Sol. of Labor, Karen I. Ward, Associate Sol., Special Appellate and Supreme Court Litigation, Charles I. Hadden, Appellate Litigation, Elaine D. Kaplan, James E. White, Regional Sol., U.S. Dept. of Labor, Washington, D.C., for plaintiff/appellee/cross-appellant.
 Before LAY, Chief Judge, McMILLIAN, Circuit Judge, and DUMBAULD,* Senior District Judge.
 DUMBAULD, Senior District Judge.
 The questions in this case are whether the Fair Labor Standards Act and its minimum wage, overtime, and record-keeping provisions (29 U.S.C. 201 et seq.), properly construed, apply to certain persons engaged in working for a religious organization, and whether, if so, such application conflicts with the religious guarantees of the First Amendment. We answer the first question affirmatively, the second in the negative.
 The Secretary of Labor, under 29 U.S.C. 217, brought an action against appellants the Tony and Susan Alamo Foundation, a California corporation, and three of its officers individually[1], alleging violations of the minimum wage, overtime, and record-keeping provisions of the Act [29 U.S.C. 206(b), 207(a), 211(c), 215(a)(2), and 215(a)(5) ] over a period of years.[2]
 The foundation engages actively in evangelism and is recognized by the IRS as a religious and charitable organization under 26 U.S.C. 501(c)(3).
 Certain persons are admittedly employees of the foundation, and controversy regarding such "outside employees" relates chiefly to factual questions as to whether and how much overtime they worked. As to these matters the findings of the District Court 567 F.Supp. 556 are not "clearly erroneous." Rule 52(a) FRCP.
 The genuine and substantial controversy in the case relates to the status of some 300 persons designated as "associates" of the foundation. The organization's evangelical work has been carried on among derelicts, drug addicts, and criminals. As part of their rehabilitation they perform useful work in the thirty some commercial businesses operated by the foundation. They also receive lodging, food, transportation, and medical care provided by the foundation. They claim to be volunteer workers and to expect no compensation. They do expect to receive (and indeed otherwise many of them could not live without resort to public assistance or crime) the aforementioned benefits of lodging, food, transportation, and medical care.
 The questions in this case are difficult and delicate. Perhaps the key to their determination is the familiar maxim of Justice Holmes that all questions are ultimately questions of degree and must be decided on their particular facts.[3]
 
 
 1
 It is clear, on the one hand, that an individual such as a prosperous lawyer ringing the bell for the Salvation Army on the street at Christmas time for a few hours is not an "employee," but a volunteer donating his time to the advancement of a worthy cause. The same is true of persons caring for children on Sunday during church services, or preparing and serving meals at a church dinner.
 
 
 2
 It must also be acknowledged that laborare est orare, that
 
 
 3
 "Who sweeps a room, as for Thy laws Makes that and th' action fine"[4]
 
 
 4
 and that St. Paul was a tentmaker,[5] and that champagne and chartreuse owe their origin to the extra-religious activities of monastic orders.
 
 
 5
 Yet it is equally clear that there comes a time when secular endeavor must be recognized as such, and passes over the line separating it from the sacred functions of religious worship.
 
 
 6
 Perhaps the distinction somewhat resembles that between the essentially governmental activities of a State as a State, and its activities of a commercial or proprietary nature. When a State sells liquor or bottled water, or runs a railroad, it casts aside its sovereign attributes and competes on the same footing as other entrepreneurs in the market place. South Carolina v. U.S., 199 U.S. 437, 461, 463, 26 S.Ct. 110, 116, 117, 50 L.Ed. 261 (1905); New York v. U.S., 326 U.S. 572, 575, 579, 582, 66 S.Ct. 310, 311, 313, 314, 90 L.Ed. 326 (1946); National League of Cities v. Usery, 426 U.S. 833, 845, 96 S.Ct. 2465, 2471, 49 L.Ed.2d 245 (1976); EEOC v. Wyoming, --- U.S. ----, 103 S.Ct. 1054, 1060-82, 75 L.Ed.2d 18 (1983).
 
 
 7
 The same metamorphosis or transmogrification occurs when a religious organization turns from the things of God to the things of Caesar.[6]
 
 
 8
 Upon careful reflection we are impelled to conclude that the foundation's activities in the case at bar have overstepped the dividing line and become subject to the requirements of the Fair Labor Standards Act.
 
 
 9
 The extensive scope and substantial character of the foundation's commercial operations are elaborated in Judge Overton's opinion. In California the foundation furnishes contract labor crews, engages in the manufacture and retail sale of clothing, and runs a service station supplying gasoline to motorists.
 
 
 10
 In Arkansas the foundation's commercial dealings include, inter alia, advertising, landscaping, service stations, restaurants, production and sale of candy, manufacture and retail sale of clothing, groceries, vehicle repairs, record keeping, construction, plumbing, sand and gravel, construction, electrical contracting, ready-mixed concrete, hog farms, feed and farm supplies, real estate development, motor carrier transportation of freight, and other commercial ventures.[7]
 
 
 11
 It must be emphasized that these businesses serve the general public, in competition with other private entrepreneurs. The gas stations, for example, serve any motorist, and are not limited to fueling vehicles used for transportation of foundation associates on their travel in connection with their evangelical efforts. The grocery stores, clothing stores, and restaurants serve the public at large, not merely associates of the foundation. The foundation's motor trucks are not confined to private carriage of supplies for the foundation's own needs, but are common carriers holding out service to the public generally.
 
 
 12
 Under the "economic reality" test[8] it would be difficult to conclude that the extensive commercial enterprise operated and controlled by the foundation was nothing but a religious liturgy engaged in bringing good news to a pagan world. By entering the economic arena and trafficking in the marketplace, the foundation has subjected itself to the standards Congress has prescribed for the benefit of employees. The requirements of the Fair Labor Standards Act apply to its laborers.
 
 
 13
 It remains to consider whether application of the Fair Labor Standards Act to "associates" of the foundation in the case at bar violates the religious guarantees of the First Amendment.
 
 
 14
 The First Amendment's provisions touching religious liberty are twofold. Not only is the individual free from all governmental coercion to participate against his will in the support of any religion (either directly, as by compulsion to attend ceremonies, or indirectly, as by compulsion through taxation to make contributions), but also is free from all governmental coercion interfering with his participation in the support (directly or indirectly) of any religion which he does choose of his own will to embrace.[9]
 
 
 15
 As stated by Justice Owen J. Roberts in Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940):
 
 
 16
 The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship.... On the other hand, it safeguards the free exercise of the chosen form of religion.
 
 
 17
 It has become customary to describe these two facets of constitutional protection as the Establishment Clause and the Free Exercise Clause, respectively.[10]
 
 
 18
 Both types of guarantee were contained in the celebrated Virginia Act for Establishing Religious Freedom[11] drafted by Thomas Jefferson[12] and pushed through the Virginia legislature by James Madison in 1786 before he left the legislative arena at Richmond to gain new laurels on the national scene at the Philadelphia convention of 1787 as Father of the Federal Constitution.[13] The major role played by Madison in securing enactment of the Bill of Rights, and in particular the religious clauses of the First Amendment, has been repeatedly recognized.[14]
 
 
 19
 The operative portion of the Virginia statute provided:
 
 
 20
 "That no man shall be compelled to frequent or support any religious worship, place, or ministry, whatsoever, nor shall be enforced, restrained, molested or burthened in his body or goods, nor shall otherwise suffer, on account of his religious opinions or belief; but that all men shall be free to profess, and by argument to maintain, their opinions in matters of religion, and that the same shall in no wise diminish, enlarge, or affect their civil capacities..."[15]
 
 
 21
 In Establishment Clause cases a three-part test has been elaborated by the Supreme Court. Government action passes muster under this clause if: (1) the statute has a secular legislative purpose; (2) its principal or primary effect must neither advance nor inhibit religion; (3) it must not foster excessive government entanglement with religion. Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).
 
 
 22
 Measured by this standard, the Fair Labor Standards Act in the case at bar does not run afoul of the Establishment Clause. The secular legislative purpose of this legislation is clear. It was set forth by Justice Reed, in Rutherford Food, cited in note 8 supra. It is straightforward secular social legislation of an economic character aimed at eliminating conditions detrimental to the health and economic welfare of workers.[16] These circumstances make clear likewise that there is no infringement of the second point of the test, regarding the effect of the legislation. It has nothing to do with religion, and neither advances nor inhibits religious concerns.
 
 
 23
 Likewise no "excessive entanglement between government and religion"[17] can be discerned in the case at bar, although this issue is probably appellees' strongest point, and NLRB v. Roman Catholic Bishop of Chicago, 440 U.S. 490, 501-504, 99 S.Ct. 1313, 1319-1320, 59 L.Ed.2d 533 (1979), the best case that could be cited in appellees' behalf, although it arose under a different statute.[18]
 
 
 24
 It should be noted that the doctrine of "excessive entanglement" arose in connection with church schools, rather than in connection with church-operated charities or commercial businesses, such as are involved in the case at bar.
 
 
 25
 In the Bishop of Chicago case the Court "recognized the critical and unique role of the teacher" in fulfilling the mission of a church-operated school (whose very raison d' etre is the propagation of a religious faith), and that the church-teacher relationship in a church-operated school "differs from the employment relationship in a public or other non-religious school." 440 U.S. at 501-504, 99 S.Ct. at 1320. Teachers being living persons, they cannot, like books, be inspected once to determine whether their teaching conforms to the constitutional standards respecting separation of church and state. Rather, there must be ongoing comprehensive and continuous state surveillance and monitoring to ensure that First Amendment restrictions are obeyed. This process necessarily involves "excessive and enduring entanglement between state and church." Lemon v. Kurtzman, supra, 403 U.S. at 619, 91 S.Ct. at 2114. The same type of continuing audit would be needed to ensure the proper application of funds, and to ensure that buildings constructed with public moneys were never used for religious instruction. Ibid., 608, 620-22, 91 S.Ct. at 2109, 2114-2115, 2116.[19]
 
 
 26
 The Bishop of Chicago case, which shows to what length the Supreme Court will go in restricting coverage of a statute in order to avoid raising substantial constitutional questions with regard to "entanglement", was itself a church school case and implicated the unique role of the teacher and the danger of government involvement in day-to-day administration and monitoring.
 
 
 27
 Application of the Fair Labor Standards Act in the case at bar, however, would be more akin to the inspection of textbooks which Lemon v. Kurtzman distinguished from the continuous monitoring required where the unintentional and spontaneous conduct of teachers constituted the human factor creating the danger of infringing the "wall of separation" between church and state. 403 U.S. at 619, 91 S.Ct. at 2114. The role of public officials in enforcing wage and hour requirements would be more analogous to the task of accountants or auditors examining the books of a business enterprise. Their function is to scrutinize written records relating to past transactions rather than to evaluate the "live" activities of teachers within the framework of administrative policy.
 
 
 28
 Another significant distinction which weakens the force of the Bishop of Chicago case as a possible precedent for the case at bar is derivable from the differing nature of the statutory schemes involved. Though the general policy and purpose of both statutes as social legislation for protecting the health and economic welfare of workers is similar,[20] the mechanisms utilized are quite different.
 
 
 29
 The Fair Labor Standards Act, as stated above, effects it objectives by the dull and detailed financial technique peculiar to accountants. The National Labor Relations Act on the other hand, utilizes, inter alia, the methods of collective bargaining and elections to choose employee representatives.
 
 
 30
 Collective bargaining, like all bargaining, is confrontational and adversarial in its nature. Each side is motivated by self-interest and seeks to increase its own benefits at the expense of the opposing party. Conflict is inherent in the situation. Similar partisan contests infect the process of electing employee representatives, as competing labor unions strive for mastery. These aspects of the operation of the Labor Relations statute dominated the Court's thinking in the Bishop of Chicago case (440 U.S. at 503, 99 S.Ct. at 1320), but have no bearing on the application of the wage and hour requirements in the case at bar, or on the calculation of the amounts due the underpaid workers.
 
 
 31
 There is surely no constitutional right, under the religion clauses of the First Amendment, to pay substandard wages.[21]
 
 
 32
 The essence of the Establishment Clause is its prohibition of coercion by governmental power applied for the benefit of religion. Such coercion may consist in compulsion to participate in religious activities or ceremonies, or in compulsion to pay taxes for the support of religious activities or programs. As succinctly summarized in the landmark Virginia legislation sponsored by Jefferson and Madison which was quoted hereinabove, the prohibition forbids governmental compulsion either "to frequent or support" any religious activity.
 
 
 33
 Obviously, appellants in the case at bar are not being compelled by the government to "frequent" any religious observance. They are not being dragooned into attending any church services or ceremonies against their will. It is equally plain that they are not being compelled to "support" any such activities. All that they are compelled to do is to pay the standard living wage for work done in their commercial enterprises. This is purely a matter of social legislation in the field of economic welfare, not religion. Appellants' contention is a far cry from Jefferson's pronouncement "That to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhors is sinful and tyrannical."[22]
 
 
 34
 Appellants' contention that the Free Exercise Clause would be violated by application of the wage and hour requirements in the case at bar is even more clearly without merit. Such enforcement of wage and hour provisions cannot possibly have any direct impact on appellants' freedom to worship and evangelize as they please. The only effect at all on appellants is that they will derive less revenue from their business enterprises if they are required to pay the standard living wage to the workers. And the Supreme Court has squarely held that legislation otherwise legitimate does not violate the Free Exercise Clause merely because financial detriment results. Braunfeld v. Brown, 366 U.S. 599, 605-606, 81 S.Ct. 1144, 1146-1147, 6 L.Ed.2d 563 (1961).
 
 
 35
 With respect to the Government's cross-appeal, we conclude that the District Court's proposed procedure requiring "associates" to initiate proceedings to obtain payment of amounts due them does not comport with the policy of the statute. It would place on the employee a burden properly falling upon the employer.
 
 
 36
 As the Supreme Court held in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88, 66 S.Ct. 1187, 1192-1193, 90 L.Ed. 1515 (1946), it is the employer who is charged with the duty of record-keeping so that the amount of work performed and compensation earned may be calculated with precision. An employer failing to comply with this duty cannot complain if the record is deficient and the court must resort to a reasonable approximation in computing the amount of damages awarded.
 
 
 37
 The solution to the problem presented "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes" is not to "penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying the compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." (328 U.S. at 687-88, 66 S.Ct. at 1192).
 
 
 38
 The reasons supporting the Mt. Clemens Pottery standard were clearly and forcefully set forth by the Court (328 U.S. at 688, 66 S.Ct. at 1192-1193):
 
 
 39
 The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of Sec. 11(c) of the Act. And even where the lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances. Nor is such a result to be condemned by the rule that precludes the recovery of uncertain and speculative damages. That rule applies only to situations where the fact of damage is itself uncertain. But here we are assuming that the employee has proved that he has performed work and has not been paid in accordance with the statute. The damage is therefore certain. The uncertainty lies only in the amount of damages arising from the statutory violation by the employer. In such a case "it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." Story Parchment Co. v. Paterson Co., 282 U.S. 555, 563 [51 S.Ct. 248, 250, 75 L.Ed. 544]. It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages. Eastman Kodak Co. v. Southern Photo Co., 273 U.S. 359, 377-379 [47 S.Ct. 400, 404-405, 71 L.Ed. 684]; Palmer v. Connecticut R. Co., 311 U.S. 544, 560-561 [61 S.Ct. 379, 384-385, 85 L.Ed. 336]; Bigelow v. RKO Radio Pictures, 327 U.S. 251, 263-266 [66 S.Ct. 574, 579-580, 90 L.Ed. 652] [Italics supplied].
 
 
 40
 This Court, in several cases, has consistently followed the Mt. Clemens Pottery standard. Marshall v. Van Matre, 634 F.2d 1115, 1118-19 (8 Cir.1980); Mumbower v. Callicott, 526 F.2d 1183, 1186 (8 Cir.1975); Mitchell v. Williams, 420 F.2d 67, 69-70 (8 Cir.1969). That standard "requires courts to apply practical standards" (420 F.2d at 69) and does not permit employers failing to keep the records required by law "to benefit from their failure to do so" (526 F.2d at 1186). The Mt. Clemens Pottery standard is applicable notwithstanding the employer's "good faith" and lack of intention "to violate the act purposefully." (634 F.2d at 1118).
 
 
 41
 But although it is clear that the employer has the burden of establishing the amount of damages to which the employee is entitled, Donovan v. Williams Chemical Co., 682 F.2d 185, 190 (8th Cir.1982), and has a duty to keep records pertinent to this calculation, we are unable to accept the Secretary's contention that no other evidence may be utilized for this purpose than the records which the employer is required by law to keep.
 
 
 42
 The court is not obliged to accept the Secretary's computation as conclusive simply because the employer has failed to provide the "preappointed evidence" (as Jeremy Bentham would express it) which he is obliged to preserve. In Williams Chemical, this Court remanded the case to the District Court with directions that "additional evidence" might be considered with respect to the issue in controversy.[23] And in Mt. Clemens Pottery, supra, the Supreme Court regarded it as appropriate for the court's determination to be based upon "the most accurate basis possible under the circumstances" and held that it is sufficient "if there is a basis for a reasonable inference as to the extent of the damages." (328 U.S. at 688).
 
 
 43
 Accordingly, in conformity with the controlling authorities, paragraph II under the heading "Remedies" of the District Court's order of December 10, 1982 is hereby vacated and the cause remanded for determination of the amounts of wages owing, such determination to be based either upon the present record or as supplemented by such additional evidence as the District Court may afford the parties an opportunity to offer (420 F.2d at 71).
 
 
 44
 At the same time upon remand the parties may wish to develop the record further with respect to the status of A.Z. Hudson, one of the Foundation's "outside employees" who was treated by the District Court as a "supervisory salaried employee" exempt under 29 U.S.C. 213(a)(1). The Secretary's contention that this defense was excluded from the case as a sanction against the Foundation for failing to comply with discovery orders seems excessively technical and would exalt form over substance, in view of the fact that at a later stage of the case the trial court permitted evidence to be admitted regarding this issue.
 
 
 45
 The District Court clearly found that Hudson was supervisor of Alamo's construction company with power to hire and fire employees (as required by 29 CFR 541.106) and that he received a weekly salary of $650 (29 CFR 541.1(f) requires only $155 per week). The court did not expressly find that he regularly supervised at least two full-time employees (as required by 29 CFR 541.105) but it is highly improbable that a construction company could operate with less than two employees. The Secretary's principal argument is that Hudson's salary was not paid continuously regardless of fluctuations in the volume of business, as required by 29 CFR 541.118.
 
 
 46
 If the facts regarding Hudson's employment were not fully and sufficiently developed so as to establish clearly whether he met the criteria for exemption vel non, the matter can be clarified upon remand.
 
 
 47
 In all other respects the judgment of the court below is AFFIRMED.
 
 
 
 *
 The Honorable Edward Dumbauld, Senior U.S. District Judge of the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 Susan Alamo, named as an individual defendant, died pendente lite
 
 
 [2]
 Sec. 206(b) requires payment by an employer to employees of wages at the minimum rate fixed by Sec. 206(a)(1). Sec. 207(a) provides for overtime pay of time and a half; Sec. 211(c) provides for record-keeping; Sec. 215(a)(2) makes violations of Sec. 206 and Sec. 207 illegal; Sec. 215(a)(5) makes violations of Sec. 211(c) illegal; and Sec. 217 empowers District Courts to restrain violations of Sec. 215, including "restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees" in violation of Sec. 215(a)(2)
 
 
 [3]
 For citation of cases where Holmes elaborates this aphorism, see Pgh. & New England Trucking Co. v. U.S., 345 F.Supp. 743, 747 n. 4 (1972)
 
 
 [4]
 George Herbert, The Elixir, stanza 5
 
 
 [5]
 Acts 19:3, 20:34
 
 
 [6]
 "And he said unto them, "Render therefore unto Caesar the things which be Caesar's, and unto God the things which be God's." Lk. 20:25
 
 
 [7]
 The fact that these various businesses, though conducted under different trade names, are controlled entirely by the foundation, makes all these activities an "enterprise" under 29 U.S.C. 203(r) and 206(a)
 
 
 [8]
 For purposes of the National Labor Relations Act, said Justice Reed in U.S. v. Silk, 331 U.S. 704, 713, 67 S.Ct. 1463, 1468, 91 L.Ed. 1757 (1947), " 'employees' included workers who were such as a matter of economic reality." The same day he applied the same test with respect to the Fair Labor Standards Act. Rutherford Food Corp. v. McComb, 331 U.S. 722, 727, 67 S.Ct. 1473, 1475, 91 L.Ed. 1772 (1947)
 
 
 [9]
 Dumbauld, The Bill of Rights and What It Means Today (1957), (2nd ed. 1963) 110-111
 
 
 [10]
 The Amendment reads: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; ...." See Abington School District v. Schempp, 374 U.S. 203, 215, 83 S.Ct. 1560, 1567, 10 L.Ed.2d 844 (1963)
 
 
 [11]
 12 Hening, The Statutes at Large ... of Virginia (1823) 84-86
 
 
 [12]
 For Jefferson's draft, which was in some particulars amended in the legislature, see 2 P.L. Ford (ed.), The Works of Thomas Jefferson (1904) 438-41, and 2 Julian Boyd (ed.), The Papers of Thomas Jefferson (1950) 545-53
 
 
 [13]
 Dumbauld, Thomas Jefferson and the Law (1978) 137, 139. Jefferson was in France from 1784-1789 serving the United States as a diplomat
 
 
 [14]
 A detailed account is given in Justice Rutledge's dissenting opinion in Everson, 330 U.S. at 33-41, 67 S.Ct. at 520-524. See also Dumbauld, The Bill of Rights and What It Means Today (1957, 2nd ed. 1963) 7-8, 21, 23-24, 33-44, 48; Dumbauld, "State Precedents for the Bill of Rights," 7 J.Pub.Law (1958) 323
 
 
 [15]
 It will be noted that the Virginia act, besides establishment and free exercise clauses, provides a third guarantee, that civil rights shall not be affected by reason of religious views. In the federal Constitution, this point is covered by Article VI, clause 3, providing that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." In England dissenters from the established church were subject to the civil disability of exclusion from public office, as well as from the practice of law, medicine, or any other liberal profession. J.R. Tanner, Constitutional Documents of the Reign of James I (1930) 109. They were also obliged to attend, and to pay taxes to support, the services of the established church. Tanner, Tudor Constitutional Documents (2nd ed. 1930) 153, 197. They were also forbidden to engage in any other form of religious worship. Ibid., 119-20. Likewise in Virginia, under the harsh code of laws issued by Sir Thomas Dale in 1611, failure to attend church services was punishable by death. Dumbauld, Thomas Jefferson and the Law (1978) 126, 232
 
 
 [16]
 Though Everson v. Bd. of Education, 330 U.S. 1, 15-16, 67 S.Ct. 504, 511-512, 91 L.Ed. 711 (1947), the pioneer leading case on the Establishment Clause in an educational setting, had been decided only four months earlier (a 5-4 decision with strong dissents by Justices Jackson and Rutledge) the idea of any infringement of that clause by the economic impact of the Fair Labor Standards Act did not cross the mind of any member of the unanimous Rutherford court
 
 
 [17]
 403 U.S. at 614, 91 S.Ct. at 2112
 
 
 [18]
 In Rutherford, supra, 331 U.S. at 723, 67 S.Ct. at 1473, it was said that the Fair Labor Standards Act is "social legislation ... of the same general character as the National Labor Relations Act" and the Social Security Act
 
 
 [19]
 But see Tilton v. Richardson, 403 U.S. 672, 687-88, 91 S.Ct. 2091, 2100-2101, 29 L.Ed.2d 790 (1971); Hunt v. McNair, 413 U.S. 734, 745-49, 93 S.Ct. 2868, 2875-2877, 37 L.Ed.2d 923 (1973), where the need for inspection was found to be insignificant
 
 
 [20]
 See note 18, supra
 
 
 [21]
 The right of a State to pay substandard wages, recognized in League of Cities v. Usery, 426 U.S. 833, 844-45, 96 S.Ct. 2465, 2470-2471, 49 L.Ed.2d 245 (1976), was based on principles of federalism, not on First Amendment grounds
 
 
 [22]
 2 Ford, Works of Thomas Jefferson (1904) 439. On another occasion he wrote: "The restoration of the rights of conscience relieved the people from taxation for the support of a religion not theirs; for the establishment was truly of the religion of the rich, the dissenting sects being entirely composed of the less wealthy people." 1 Ford, Works (1904) 78. Relief of dissenters from paying tithes to maintain the established Anglican church in Virginia was one of Jefferson's early legislative triumphs in the Virginia House of Delegates, after what he regarded as one of "the severest contests in which I have ever been engaged." Ibid., 62-63. The thoroughing act for religious freedom did not become law until a decade later. For comment on the act of December 9, 1776, 9 Hening, Statutes (1821) 164, see 1 Boyd Papers of Thomas Jefferson (1950) 525-58; and Dumas Malone, Jefferson the Virginian (1948) 274-80
 
 
 [23]
 682 F.2d at 190. See also Donovan v. New Floridian Hotel, Inc., 676 F.2d 468, 474 (11th Cir.1982), which speaks of the failure of the employer to produce "records or other evidence" to establish the "reasonable cost" of facilities provided to employees. (Italics supplied)